Each side will have 15 minutes, and Ms. Singh for Travelers, so whenever you're ready, you may proceed. Good morning, Your Honors. May it please the Court, Rupa Singh on behalf of the appellants with me as co-counsel is Michaela Bannock, who clied the case. May I please reserve three minutes for rebuttal? So this Court may well be wondering why it should reverse a judgment that follows a four-year litigation, a 10-day jury trial, and a partially successful post-trial motions that resulted in a not unsubstantial rebuttal. The answer is because a thoughtful review of the record and the law should leave this panel with a firm and definite conviction that demonstrable legal and evidentiary errors pervade this judgment. I'd like to spend a little bit of time today just focusing on two of those errors in the underlying judgment before I turn to the fee award that is the abuse of discretion. The first set of errors has to do with the calculation of a total number of delay days, and the second error has to do with the computation of delay damages, which comprises field office overhead or who, home office overhead or who. So let me turn to the first set of errors. There's a case that I'd like to refer to the Court, which is cited in our opening brief, MBA Construction v. Reading School District. And it says that a contractor, it's a California approved case, and it says that a contractor is not entitled to count as delay days any days after its optimistic estimate of when it will complete a project, as opposed to the time for project completion in the contract. So here, what PORGES did, what PEG, I'm sorry, the APLE did, is its expert testified that the schedules, the construction schedules that were prepared, and there was testimony that these construction schedules were prepared, it's undisputed, long after the fully integrated subcontractors were signed, which had, of course, the dates for contractual performance on each project, 570 calendar days for Military Working Dog, 450 calendar days for Red Horse. These were the maximum times for performance, and it is undisputed that these were build and design times, and what you subtract out of that is the undisputed time for design phase, that's 120 to 150 days. But instead of using those times, what PEG's expert did is it arbitrarily chose one of the most optimistic construction schedules on each project. He admitted that they reviewed more than a dozen schedules on Military Working Dog. He also admitted that he reviewed 23 to 26 schedules on Red Horse. But instead of using the schedule that has the baseline, which says that the contract performance is 360 days on Red Horse, or 354 days on Military Working Dog, he chose the most optimistic schedule that said that Military Working Dog is- Didn't the jury hear all this? Didn't the jury hear this conflicting evidence? Obviously, you probably heard counsel's argument in closing. And they concluded that they awarded the late damage based on what Porges submitted. The jury did hear, but the problem is that what the jury concluded is, as a matter of law, wrong. How many delay days did the jury base the damages award on? A total of 984 delay days on both projects. And so that's five- Can you point me to, on the record, where you're getting that number? It was the number that was presented in the demonstrative closing exhibits. It was the number that was presented to the jury. She doesn't include any number of delay days. Right. It just includes the damages amount. That's right. So we don't know what the number of delay days are that the jury determined it based its damage award on. Is that correct? Well, it's true that the jury verdict doesn't contain the number of delay days, but here's how you calculate the delay damages. It's a very simple mathematical formula. You multiply the number of delay days on each project by the daily rate of who filled the office overhead or the daily rate for who, which is home office overhead. So the first variable is delay days. The second variable is the rate, and you multiply those. The reason that we know that the jury adopted the 984 delay days is because it adopted verbatim the multiplication provided by Pegg's counsel in closing argument. Verbatim. And those are the number of delay days that Pegg proposed throughout, and they were based on using construction schedules long after the integrated contracts were signed that estimated very optimistic schedules that could not have been used to vary the subcontracts. That's how we know that that's the number that was used. They used not only the delay day number, but they also used the who and who daily rate computations. So your argument is really not so much on the amounts. The amounts are what they are based on this formula of calculation, but what you're saying is that there's no possible way that the delay days could be 984 days because at most the project, if you adopt the numbers from the RFP or if you adopt the numbers from the prime contract, those numbers aren't even as high as 984 days for the work on the projects. With just a little slight modification, it's not so much that we're saying that we only have a problem with the delay days. We have a problem with both sets of variables. There were errors of law in the evidence that was allowed to be presented about what was the delay day and what was the daily rate. And so as a result, the damages are wrong because each variable in the mathematical formula was wrong. Let me help you. Let me illustrate this is another way. There's another case that's cited in our opening brief, and it's West versus Allstate Boiler. It's a Federal Circuit case, and the court there said that delay days are by definition days that extend the time for contractual performance, not days by when the performance is suspended. So in that case, the government undisputedly suspended performance for 58 days. But the Federal Circuit said that only extended the performance by the contractor by 22 days. And as a matter of law, the contractor could not claim 58 days of suspension. It could only claim 22 days of delay. So now let's go back to the optimistic construction schedules that were adopted by PEG. 168 days on Military Working Dog, 204 on Red Horse. On pages 17 to 23 of its answering brief, PEG lays out when it started Military Working Dog and when it finished, or was supposed to finish, and when it started Red Horse and when it was supposed to finish. It says it started Military Working Dog on September 27th, or I'm sorry, July 2012, and was supposed to finish in December 2012. So by its own reasoning, and by the reasoning of the Allstate case, the only delay days could have been after December 2012, right? Because that's when it was supposed to finish, but its performance was extended. But then if you look at the delay days that were claimed, there were 79 days of mobilization that were claimed before December 2012. Those could not have been counted because they did not extend the time for PEG's performance. Similarly, on Red Horse it said it started performance in February of 2013. But those are not errors of law, are they? Well, because there's a matter of law, there's a Federal Circuit case just on point saying times of suspension during contract performance as a matter of law are not delay days. And that's exactly what the jury was allowed to conclude, that work stoppages, mobilization delays, delays for light serving work, delays for contract slab repairment, during even PEG's admitted time for performance, which we dispute based on the RFPs. So PEG's saying we were supposed to be there from July 2012 to December 2012. By PEG's own reasoning, and this West case, the only delay days could have been after December 2012, but that's not what it did. That's an error of law. Those should never have been allowed to be presented to the jury as delay days. The same is true for Red Horse. February 2013 is when PEG says it started. It was supposed to finish in October 2013. So by its own reasoning, any days between February and October 2013 can't be delay days under West v. Allstate. And yet, if you look at the delay days, there was 31 days of delay for trenching, all before that time period in February and March of 2013. There were 80 days for concrete slab repairment, much of which fell in 2012. And how does your argument work with the jury's finding and adoption of PEG's experts' calculation of dates for working the job? So if we have to accept the jury's finding that Working Dog, you know, the reasonable time for performance on Working Dog was 168 days, and for Red Horse it was 204 days, and that is a finding based on the jury's consideration of all the evidence that was presented to it, then how do we reconcile that with the argument you're making right now, which is what is permissible in terms of the delay day calculation? Well, because the evidence is, as a matter of law, erroneous. I know this is a very complicated thing for me to be arguing, because basically evidentiary standard is clear error, but it's wrapped up in a BOA review, because the law says you cannot have delay days that don't extend the contract time for performance. So let's say, just to cite your example, we accept 168 days on Relative Working Dog. Look at PEG's answering brief, pages 17 to 23. It lays out when those 168 days would have expired. It says on Military Working Dog, those 160 days would have expired in December 2012. But yet, its expert was allowed to tell the jury about delay days during that time, but West says you can't do that. So the error is that when Pacific West objected to Mr. Pezzulla's testimony in limine and asked for the court to exclude it, it was error not to exclude it, not because an expert shouldn't be allowed to testify on matters that are within his expertise, but because an expert cannot be allowed to testify to matters that are against the law. And I've just cited you two cases that say you cannot have delay days that don't extend the time for contract performance. Let me also move on to the second fundamental error in the underlying judgment, which is to say the calculation of the total daily rate and the who daily rate and the who daily rate. Now, it is a correct premise of law that damages can be approximate and need not be precise. But there is not a single case cited by PEG that stands for that proposition when the damages are calculated based on a mathematical formula. Every single case involved difficult to ascertain damages that were necessarily speculative and had to be valued approximately. For example, there is a case, SCI Funeral Services, in which the court had to value the easement next to a cemetery that had particular value to the parties. There was another case where the valuation had to do with stock options treated for lifetime membership in a club. And the court had to value that lifetime membership based on actuarial tables about life expectancy. This is not our case. Our case, as PEG even admits, is a case of delayed images used, calculated in a recognized mathematical formula based on receipts and documentations that are available readily on every construction project. You multiply delay days by the rate. Here's the problem with the daily rate calculation. I've already explained what the problem was with the delay days. With the daily rate, Pizzullo testified that he took the job cost reports throughout the project duration for the entire project and he divided them by the number of days on site to come up with a daily rate. But he admitted that he never made sure that consistent with jury instruction 14.3.1, the items on the cost reports were actual FOO. FOO was described to the jury in jury instruction 14.3.1 as costs incidental to construction that increase over time because of the delay. But instead, here you had cost reports that had entries for printing labels for equipment, for construction costs, for Home Depot, inscrutable other entries for Bank of America, nothing that was qualified as FOO. So in fact, Pacific West's expert went through and lined out the items that could not be FOO and only left in as a benefit of the doubt those that could be. And let me just give you an example. Without substantiation, he couldn't tell. So field overhead is for actually having a field office on the construction site. It was undisputed and for having a dedicated supervisor. So if you had a field cost for the supervisor to go check on a job site, that's FOO. But if you have field for a construction equipment that's being used, that's a direct construction cost, it's not compensable of FOO. So our expert left in the inscrutable field cost because without substantiation, it was not clear what the field was for. What that means is that the daily FOO rate was inherently wrong. And the case that I point to is HPS Mechanical. It literally says in there that you cannot average the cost reports and come up with an average FOO number, and that's exactly what happened here. And in the last few hundred pages of volume 39 of the ER, is our expert's inter-lineation of all the costs that could not possibly have been FOO. And so I commend to the court those two exhibits there, 288A, 638, 638, and 288A. And they're the last hundred pages of volume 39. Thank you, Ms. Besson. You're out of time. We'll put two minutes on your clock for rebuttal and make any final points that you want. I really appreciate it. Thank you for your indulgence. Good morning. May it please the court, my name is Louis Bloom. I'm here on behalf of Porch's Electrical Group. And I will confess that counsel's argument for me, for Luke, I thought Pacific West Builders was going to focus on some other issues, so I'm going to pivot a little bit to the issues that were addressed by Pacific West Builders. Before I do that, I do want to establish the overarching theme here. This is a substantial evidence case. We had a ten-day jury trial. There was a motion for judgment as a matter of law that was denied. There was a motion for new trial that was granted in part, followed by remitted. All of that funnels down to, as we sit here today, is this judgment supported by substantial evidence? Is there evidence that Porch's work was impacted as a result of those impacts? They were required to stay on site longer than required by the contract? And was there a cost associated with that? And what Pacific West Builders wants the court to do is start nipping around the edges and carving a little off here and carving a little off there and ultimately get a redo. And I want to note that strategy. That was the strategy at trial. The strategy at trial was not to provide an alternative accounting of the number of delay days. The strategy at trial was not to provide an alternative accounting of the field office overhead or the home office overhead. The strategy at trial was to point out mistakes, to make different arguments, and then ultimately say to the jury, you can't trust any of this. You should award zero. And Pacific West Builders goes to great lengths in their briefs to say, hey, we never disputed that they were owed the contract balance. We never disputed that they were owed money. They brought this lawsuit prematurely. While arguing at the same time at trial that the lawsuit, as to the maturity, was time barred. So that's happening again here today. Oh, you can't trust any of this. We should go get a redo. Well, that's the purpose of having a jury. All of this was presented to a jury. There are two sides to the story. There are two different ways to look at the evidence. This board just put on their evidence. They laid out their accounting of days. They laid out their accounting of dollars. It's supported by substantial evidence. PWB pointed out what they contended was an error here, an error there, an error here, and said don't trust any of this. Give peace. Do you agree with your friend on the other side's statement that the number of delay days that the jury found that it based its standards award on was 984 days? I know because there are two contracts. And one of the things that Pacific West Builders tries to do in their brief is say, you're supposed to consider all of these together. That's not true. The Red Horse contract is on one military base. The Working Dog contract is on a separate military base. They're at opposite ends. Yeah, but the construction was happening essentially at the same time. Right, but so was the accounting. So the law is very clear. Unless we have two contracts that reference one another or are sort of connected in a real meaningful fashion, you look at them separately. So that's point number one. So are you saying that if PEG is performing work on Red Horse for 200 days, I'm just using sort of made-up numbers here, 200 days, and on those same 200 days they're also doing construction work on Red Horse, then what we really need to assume that's 400 days of work. It is because it's two separate contracts. Those 400 days of work also have different people doing the work during those course of days. They have separate financial records. So in each case where PEG was paid for its work, if there were two contracts and, in fact, it was paid for the work that it was performing on both projects, even though they were happening simultaneously, they were paid a full contract amount. Well, some less, 100,000 less over here, 20,000 less, whatever it was. But, you know, you were paid in excess of a million dollars for the projects, correct? We did. PORGES performed the work on each project pursuant to the plans and specifications on each project. In an attempt to follow the schedule on each project, they billed separately for each project, and they were paid separately for each project. But what I want to make the point is even if you accept Pacific West Builders' proposition that we should look at these together, you're going to get a very similar result. And the reason for that is you're going to take both buckets of fuel off this overhead and you're going to put them together, right? So if you look at them together and the premise that they're proposing, you're ultimately going to have a higher daily rate. So I don't think we go there. I was focused on the daily rate. I'll tell you what's troubling me is that you have these contracts that have some days associated with them. And even if we accept what the jury found in terms of the number of days that it should have taken to complete the work on each project, the number of delayed days that the jury's damage award was based on, it exceeds by five-fold the number of days that were actually worked on by Porges and was paid for under the contract. That's not true. Porges was out there all of the days. That's why it's asking for all of the days. Porges' argument is as follows. I was supposed to be on the project, for instance, on Red Horse. I'm trying to make sure I get my numbers right here. Let's say for 168 days. I was out there significantly longer. So 168 days tick by. Boom. Per the schedule that PWB put together, that PWB's experts said was reasonable, that the trial court looked at and said, yeah, that's a reasonable measure of a reasonable expectation where no duration is stated in the prime contract or in the subcontract. Every day I'm out there after that, I'm doing the same work I contracted to do. I'm just doing it over a much longer course of time. What's that number? What's the number? The days. Okay, if the court will indulge, I'm going to look at my notes because I don't have all this committed to memory. So on Military Working Dog, the original contract duration was 168 working days. That's what Porges estimated. No. That's pursuant to Pacific West Builders Schedule update, which Pacific West Builders submitted to the federal government to tell them how they were planning to do the work. That duration was confirmed as a reasonable duration for Porges' work by David Porges, by Jeff Pizzullo, and by Pacific West Builders. Is that specifically the days that reasonably if it would be working? Correct. Okay, so construction schedule. But based on a whole bunch of factors that are submitted in the submissions in the government. Right. So I'm going to build something. Right. Step A has got to come before step B. Step B has got to come before step C. What's the record site for what you just said that Pacific submitted it to the government? It adopted the 168 working days as a reasonable calculation and then knew that itself and conveyed it to the government. Okay. Where's the record site for that? So they were discussed as schedule updates, and I can't give you a record site that somebody said it was submitted to the government. But the purpose of the schedule updates is that these are being used to track the progress of the job, and they're being used. So they're going up and going down. They're telling the owner here's what's going on, and they're going down to tell the subs what to do. Okay, so you were starting to explain to me then that based on the 168 days, then how many days beyond that? What's the number? So Porgy's out there for a total of 669 days on Military Working Dog, which is 501 calendar days longer than they were supposed to be out there. But the whole time they're out there, it costs you a certain amount of money every day. Does it cost me the same amount of money literally every day? No. But there is a pool of field overhead costs, costs that increase with time. It doesn't matter how much work I do. I could do zero work, or I could do 100% of my time. So it's 501 days. That's the delta. That's the delta. And what about on Red Horse? On Red Horse, the delta is baseline was 204 days. The actual duration was 607 days. I don't have the math, and I'm not good at it. Well, let's see. 403 days. Thank you. So, again, they're separate. The job cost reports that counsel talked about, as far as we disagree that this is a time-related cost, we disagree that this is a field overhead cost. But if the jury found its delay damage is based on 984 days, even if we accept what you're talking about, which is the delta is 904 days, how can the jury verdict be based on substantial evidence? How can we say that it was supported by the evidence when your own numbers, as you walk me through them right now, have a difference of 80 days? Well, I think we're talking past each other. For one thing, the special verdict form does not include an interrogatory on the number of days total or on either project. Well, that's why my first question to you this morning was, do you agree with the 984 delay days? No, I do not. So what is the number of days that the damages award was based on? It's separated by contract. On Military Working Dog, it's 501 days. On Red Horse, it's 403 days. Then you take the field office overhead. Can you point me to where you're getting that? Because I agree with you the jury verdict form does not delineate the specific number of delay days. So we're trying to back into that number based on the damages. So those are the days. That's the evidence that was presented by Porges at trial. It's set forth in our brief, basically, the evidence of when Porges was. Do you have anything to point me to in the record that shows what the jury decided in terms of the number of delay days? I do not. What was this chart that was used in closing? The same reference chart that was used in closing that had 984. What's that? The chart, as I understood, that was used in closing was a demonstrative that Pacific West Brothers was allowed to use that showed field office overhead entries lined out by their expert. He was disagreeing that they were compensable field office overhead. So let me finish off the 984 days, and then I'd love to talk about that. We put on our case. We gave the math to the jury that I just went through. We were supposed to be out there 204 days on Red Horse. We were out there 607 days. The reason we were out there longer is we could not complete our work. Why could we not complete our work? Because it wasn't available to us. Why was it not available to us? Because the site wasn't ready. It was Pacific West Builders' responsibility to make the site ready for us. Or there was a design issue that wasn't resolved. But as a subcontractor, your life is very simple. I go out there when I'm told to get out there, and I can't leave until the last thing I need to do is ready for me to do it. Let me ask you this question to make sure I understand it. Is this something that would have been law-centric, or would it be the same argument if you were on a project in San Diego and your headquarters were in Los Angeles? The bucket of damages? Yeah. The delay is the inconvenience that's factored into the delay. It has nothing to do with location. Nothing. That's why we call it field overhead. It's expenses that are being expended on the job site. I'm talking about delay. Well, delay is delay. So delay is when did I start the work, when did I finish the work, and what's the delta between that total and when I expect it? Because the project isn't ready for the electrical work. Yeah. Do you still send your crew there notwithstanding the project isn't ready for you? We mobilize when we're ordered to mobilize on the expectation that the work will be available. So the record shows that we didn't just go out there and hang around. We went out there, mobilized our forces to the site when directed by Pacific West Builders. On the expectation of everybody's expectation that work would be available. But what happens is a series of impacts throughout the course of the project that prevent me from ever finishing anything. And so as a consequence, I'm out there the whole time. And so there was this discussion of, well, you can't claim for a delay during your original duration of performance. I agree with that. But what you can claim for is delay during the original course of performance that pushes you past or outside the original course of performance. And that's what that case says. We actually agree with the whole name of the case. I think it's the West case. So at the end of the day, jury trial. We put on all of this evidence. What was our expectation of how long we're going to be out there based on Pacific West Builders' own documents? There's nothing to the contrary in any other contract document. We're told to mobilize. We're out there. We're trying to do work. But we can never execute on our plan because the work is never fully available to us. Ultimately, at the end of the day, the thing that controls the total duration of Porgy's work is, what's the last thing I need to do? On one of the projects, we had to do this permanent power connection. On the other project, we had to hook up a flowable tank system. So I'm just waiting for that to get done. But I can never get my guys off the job because there's always an expectation it's going to be ready. These are design issues somebody's trying to work out, or we're waiting on somebody to finish their work. I don't like to say it that way because I think we have to look at the project separately. Yeah. Sure. Yes. It did not. It came up with a damages figure, not a block of damages. Yes. The jury actually separated the two projects in the interrogatories. So the damages, the delay, they're actually specified. The principle is correct. Yeah. I told them the number of days. I told them a rate that I thought was appropriate. They filled in those exact same numbers on the interrogatory. No. I don't think it. It doesn't. It comes out to 501 days on Working Dog and 403 days on Red Horse. Everything was presented separately, and the jury responded to it separately. I don't know. I don't understand how Pacific West Builders gets this 984 days. They're two separate contracts. You have to keep them separate. There was a lot of disputed facts. We argued for a long time. The judge, Judge Marshall, carefully considered their motion for a new trial. But at the end of the day, I can't get off the job until the work's done, and I'm spending money every day I'm out there, and we're entitled to get paid for those extra expenses on behalf of Pacific West Builders. Thank you, Mr. Corn. Thank you. I appreciate that opportunity already. Thank you, Your Honors. I'm pleased to say that I do have some answers for you. Judge Esai, you were asking where in the record, in fact, all of you were asking, where in the record can we see that it's 984 total delays, which is 580 on Working Dog and 400 on Red Horse? Let me give you the ER sites. On ER 9430 is a demonstrative that was presented by Peg that says that Working Dog field overhead has 501 days multiplied by a daily rate of 202. It comes up with a number for the FOO damages. If you then compare that number to 1ER78, that's the jury verdict, you will see the exact number from the demonstrative in the verdict. So that's 501 delayed days on Working Dog FOO. Now, another, so this is the interesting thing, Your Honor. For WHO, which is the Home Office, our head, presented 580 days because our expert pointed out that the 79 days of mobilization were not eligible as delay days because they occurred during contract performance. So inexplicably, in its demonstrative for WHO, it did not, Peg did not take out those 79 days, making it 580 days, but in demonstrative for FOO, which I just gave you the site for, it did. So if you look at the demonstrative for WHO, it's ER9431. It says the daily rate is this much. The delay days is 580 days. It multiplies that number and comes up with the damages figures of 86,768. Compare that to the jury verdict, 1ER78. You will see the exact number in the jury verdict. That's how you know that the jury adopted everything that Peg said in terms of delay days and daily overhead. Same thing on Red Horse. Let me give you the site, ER9432. Peg says Red Horse field overhead is 404 delay days. By the way, that's how you come up with 984. You add 580, 404. We were using it as a short form to say 984 total, but it's 580, sometimes 501 on Working Dog, and then 404. So this site, ER9432, compare that to the 78 site, ER78, and you will see the exact number that Peg proposed, adopted by the jury. That's how you know that the delays are those all of your record sites that you were going to provide us. I want to make sure we get all of them. I have a question on what is your best argument for, because it seems like the delta between the reasonable time to do the work or the contracted time to do the work versus the extended time that they were required to be there because of various problems is important. Those numbers are important. What's your best argument for whether or not the right numbers that the 168, I'm trying to find the exact numbers, the 168 days for Working Dog and 204 days for Red Horse, that we can ignore those determinations that the jury made? What is your best argument for that? Because I think that that is something that the jury decided after seeing all of the evidence. So whether or not, you know, you agree with that, as we sit here today, it seems sort of irrelevant to me unless you can tell me why we need to consider different days, like 450 days or 570 days or whatever days were in the prime contract or the RRP. Right. So the first thing is that these numbers were found in construction schedules that were prepared by PWP Pacific West. It's outside consultant. It's undisputed that these schedules were prepared long after the fully completed work. And you argued that to the jury? Yes. And they rejected that argument? I don't think they understood it. And here's what we argued. We cross-examined. We couldn't cross-examine their expert because he provided video testimony after all. That's a legal argument you have, not that we disagree with their conclusion or that you think it was wrong. I want to know why you think we can review that. You can review that because you can see that in the RFPs for each subcontract, a maximum number of days for performance is provided. In the RFP for Military Working Dog, it says 570 calendar days is the design and build for PEG. In the Red Horse RFP that was integrated into the subcontract, it says 450 days of performance design and build for Red Horse. Those are the maximums. From that, you can take away the undisputed design phase in which PEG was not involved. And because it's undisputed that PEG was the first and last out electrical subcontractor, you know that it's time for performance. It's that calendar days in the RFPs fully integrated minus design phase, which comes to a range in 300 and some change days that are in our briefing, not 168 and 204. And let me just also address what counsel said. Unfortunately, I'm afraid that my flirted friend is mistaken. These schedules were never submitted to the government. They were. Are you sure? Yes. We appreciate your argument. Thank you so much, Your Honor. Thank you, counsel. This case is now submitted and we'll move to a vote.
judges: BYBEE, Fisher, DESAI